UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OKLAHOMA

| | | | |
|---|---|---|---|
| IN RE: | ) | | |
| | ) | | Filed/Docketed |
| RHEIN, THOMAS J. and | ) | Case No. 12-10237-R | Jun 10, 2013 |
| RHEIN, ELAINE M., | ) | (Chapter 7) | |
| | ) | | |
| Debtors. | ) | | |

| | | |
|---|---|---|
| SCOTT P. KIRTLEY, TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 12-1048-R |
| | ) | |
| NEAL STENZEL, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Before the Court is the Complaint filed by Plaintiff Scott P. Kirtley, Trustee of the Chapter 7 estate of Debtors Thomas J. and Elaine M. Rhein ("Trustee"), in which Trustee seeks an order avoiding a security interest held by Defendant Neal Stenzel ("Stenzel") in estate property and an order requiring Stenzel to turn over such property to Trustee. Also before the Court is Defendant Stenzel's Motion for Relief from Automatic Stay and Motion for Order of Abandonment of Property filed April 4, 2012 (Main Case Doc. 67), wherein Stenzel seeks an order permitting him to foreclose the security interest Trustee seeks to avoid.

A trial on the merits was held on April 25, 2013. Upon consideration of the pleadings, testimony and documentary evidence admitted at trial, arguments of counsel, and applicable law, the Court finds and concludes as follows:

**Jurisdiction**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(E) and (H), and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

**Findings of fact**

Debtor Thomas J. Rhein ("Rhein") was in the business of buying and selling classic automobiles.[1] Trustee and Stenzel stipulate that it was Rhein's business practice to title the automobiles he purchased in the name of Ventura Classics, Inc. ("Ventura"), that Ventura acted solely as an agent for Rhein, and that Ventura had no ownership interest in automobiles purchased by Rhein.[2]

On or about November 16, 2011, Rhein acquired a 1967 Chevrolet Corvette, VIN *********121526 ("Corvette") from Sinor Prestige Automobiles, Inc. ("Sinor"), in exchange for approximately $241,000.[3] Rhein paid cash for the Corvette, and it was not then encumbered by any lien, purchase money or otherwise. As was his usual practice, Rhein had Sinor assign title to the Corvette to Ventura,[4] but all parties agree that Ventura has no equitable interest in the Corvette and that the Corvette is property of Rhein's bankruptcy estate.[5]

---

[1] Pre-Trial Order (Adv. Doc. 19) at 2, ¶ 5.

[2] Pre-Trial Order at 2, ¶ 5.

[3] Pre-Trial Order at 2, ¶ 3; Certificate of Title, Stenzel Exhibit 4.

[4] Certificate of Title, Stenzel Exhibit 4.

[5] Pre-Trial Order at 2, ¶¶ 4, 5; Affidavit of Brian Goss, Stenzel Exhibit 6.

In December 2011, Rhein's neighbor told him about an opportunity to invest in a Colorado start-up company, Revolutions in Lighting, Inc. ("RIL"). William Lindsey ("Lindsey"), the inventor of certain technology allegedly licensed to RIL, provided Rhein an executive summary of RIL's proposed operations and its business plan. Lindsey promised Rhein a commission, or finder's fee, plus a percentage of the profits, if Rhein found someone to finance RIL.

Because Rhein had collaborated with Stenzel on some prior investments, Rhein presented the RIL opportunity to Stenzel and introduced him to Lindsey. Stenzel thereafter communicated directly with Lindsey with respect to RIL's financial needs and its earnings prospects. Lindsey represented to Stenzel that he had developed a process that "generate[d] light by utilizing radio frequencies" and that he had filed an application to patent the technology.[6] According to Lindsey, RIL was "in final negotiations to provide signs, posters, and other displays using these technologies for the 2012 NFL Super Bowl,"[7] and RIL urgently needed funds to "fulfill its contract to supply signs . . . for the 2012 NFL Super Bowl."[8] Lindsey's business plan projected that this contract would generate revenue of $12 million.

Stenzel traveled to Colorado to visit the RIL plant and discuss the business plan with Lindsey and other RIL employees. RIL had leased a 55,000 square foot building, but the space contained no office equipment, manufacturing equipment, materials, or inventory.

---

[6] Binding Agreement ("Agreement"), Stenzel Exhibit 1, at 1, ¶ 1.

[7] Id. at 1, ¶ 1.

[8] Id. at 1, ¶ 2.

3

Lindsey advised Stenzel that RIL was promised the Super Bowl contract if RIL could demonstrate that it was an operating entity by the end of 2011, and that RIL needed $500,000 immediately in order to purchase the necessary equipment and materials. Stenzel agreed to loan RIL $500,000 under certain conditions.

On December 20, 2011, Stenzel, Lindsey, RIL, Rhein, and Ventura executed a document entitled "Binding Agreement" (the "Agreement").[9] In general, the Agreement provided that, between Stenzel and RIL, (1) Stenzel would loan RIL $500,000 and RIL would use the funds to purchase equipment, materials, and supplies; (2) RIL would execute a promissory note in favor of Stenzel ("Stenzel Note") and grant Stenzel a security interest in the assets to be acquired; (3) RIL would transfer all its assets to an operating company to be formed and owned by RIL and Stenzel ("Newco"), and Newco would assume the Stenzel Note; (4) all projects using Lindsey's technology, including the Super Bowl project, would be performed by and through Newco; (5) Newco would make no distributions to its members until the Stenzel Note was paid in full; (6) Stenzel would be entitled to the first $750,000 of distributions, which were to be paid no later than June 30, 2012; and (7) thereafter distributions would be allocated 70% to RIL and 30% to Stenzel.[10]

The Agreement provided that Newco would pay Rhein the commission promised by Lindsey in the amount of $250,000, but only after Newco satisfied the Stenzel Note and had distributed $750,000 to Stenzel.[11] In addition, Rhein and Stenzel would each be paid, as

---

[9]Pre-Trial Order at 2, ¶ 6; Agreement, Stenzel Exhibit 1.

[10]Agreement at 1-2.

[11]Id. at 2, ¶ 4(m).

4

commissions, "2.5% of all Newco revenues other than revenues associated with the 2012 NFL Super Bowl . . . in perpetuity."[12]

Because Stenzel appreciated the risk of funding a start-up operation, and, moreover, the risk of doing so without time to perform adequate due diligence, he required alternative sources of security for the repayment of the Stenzel Note. To encourage Stenzel to invest, Rhein agreed to grant Stenzel a lien on the Corvette. Paragraph 4(d) of the Agreement provides, in relevant part:

> Rhein and Ventura Classics, Inc. shall take all steps, and shall sign all documents, agreements or instruments, requested by Stenzel to so transfer ownership of the Corvette, or to perfect a first lien security interest in the Corvette in favor of Stenzel.[13]

And paragraph 14 of the Agreement states, in part:

> Rhein shall transfer to Stenzel title to [the Corvette] free and clear of all liens and liabilities which title Rhein shall endorse in blank. Stenzel shall have the power to sell the Corvette and retain the proceeds to the extent that Stenzel has not received repayment of all amounts due under the $500,000 loan on or before 12 months from the date hereof.[14]

On December 21, 2011, Stenzel wire-transferred $227,422 to 3M Harold M. Pitman Company to pay for equipment purchased by and for the benefit of RIL.[15] On the same day,

---

[12] Id. at 2, ¶ 4(j).

[13] Id. at 2, ¶ 4(d).

[14] Id. at 4, ¶ 14.

[15] Stenzel Exhibit 8.

Stenzel also advanced $272,578 directly to an account purportedly held by RIL.[16] Thus, as of December 21, 2011, RIL owed Stenzel $500,000 under the Stenzel Note.

On December 30, 2011, Rhein made, executed, and delivered to Stenzel a Commercial Security Agreement granting Stenzel a security interest in the Corvette.[17] The security agreement describes the secured transaction as follows:

> [O]n or about December 20, 2011, [RIL] and [Stenzel] entered into a Binding Agreement ("Note"), whereby [Stenzel] lent [RIL] $500,000.00 in consideration of [RIL's] promise to repay the same pursuant to the terms thereof and [Rhein's] agreement to execute this security agreement.
>
> [A]s security for the Note, [Rhein] desires to grant and to confirm to [Stenzel] a security interest in [the Corvette].[18]

On January 5, 2012, Stenzel filed a lien entry form with the Motor Vehicle Department of the Oklahoma Tax Commission, perfecting his security interest in the Corvette.[19]

Less than one month later, on February 1, 2012, Rhein and his wife filed their joint petition for relief under Chapter 7 of the Bankruptcy Code, and Trustee was appointed to collect, liquidate, and administer the Rheins' non-exempt assets for the benefit of their unsecured creditors. The Corvette is property of the bankruptcy estate, and Stenzel is currently in possession and control of the Corvette.[20]

---

[16]Stenzel Exhibit 7.

[17]Pre-Trial Order at 2, ¶ 8; Commercial Security Agreement, Stenzel Exhibit 2.

[18]Commercial Security Agreement at 1.

[19]Pre-Trial Order at 2, ¶ 9; Lien Entry Form, Stenzel Exhibit 3; Lien Receipt, Trustee Exhibit 7.

[20]Pre-Trial Order at 2, ¶¶ 4, 15.

In February 2012, Stenzel advanced to RIL an additional $102,000 to "finance its operations until the NFL payment is received."[21] Lindsey represented to Stenzel that RIL fully performed the Super Bowl contract and sent a $12 million invoice to the NFL that was payable on or about May 9, 2012.[22] Lindsey also represented that the new cash infusion would allow RIL to manufacture additional NFL memorabilia, specifically 100,000 lighted belts, for which RIL would be paid an additional $2.9 million. On March 9, 2012, Stenzel, Lindsey, and RIL amended the Binding Agreement to reflect that RIL owed Stenzel a total of $602,000 under the Stenzel Note.[23]

Sometime thereafter, Stenzel discovered that Lindsey had perpetrated an elaborate hoax. The purported Super Bowl contract never existed, RIL never delivered products to the NFL, and the NFL did not owe RIL $12 million. When RIL defaulted on the Stenzel Note, Stenzel seized the equipment he had purchased for RIL and started a new company with some of RIL's employees that were not involved in the deception. Stenzel also foreclosed on a vehicle Lindsey had pledged as collateral for the Stenzel Note. RIL still owes in excess of $400,000 on the Stenzel Note. Thus, Stenzel seeks relief from the automatic stay and an order requiring Trustee to abandon the Corvette, so that he may sell the Corvette and apply the proceeds against RIL's debt.

---

[21] Amendment to Binding Agreement to Extend Lending and Investment Activities ("Amendment"), Stenzel Exhibit 5, at 1, ¶¶ 1, 3.

[22] Id.

[23] Pre-Trial Order at 2, ¶ 7; Amendment, Stenzel Exhibit 5.

According to the Rheins' amended schedules and statement of financial affairs executed under penalty of perjury (the "Schedules"),[24] as of the petition date, the Rheins had exempt and non-exempt assets of approximately $9 million and liabilities of approximately $16 million.[25] Included in the reported $9 million of assets is an alleged receivable in the amount of $3 million, which Trustee has determined is worthless because it lacks any factual or legal basis.[26] The asset total also includes the Rheins' exempt homestead, valued at $1,300,000 and subject to a mortgage in the amount of $1,665,028;[27] three fully encumbered late model vehicles;[28] $1,411,500 held in an escrow account subject to the claim of Grand Bank;[29] and twenty-one classic cars valued at $3,361,000, some of which are subject to liens, and some of which are supposedly jointly owned by "partners" who loaned money to Rhein.[30] The remaining scheduled property is either valued at zero or is exempt from claims of creditors.[31] On the liabilities side, the Schedules reflect unsecured claims of $9,468,584.31[32]

---

[24] Schedules and Statement of Financial Affairs ("Schedules"), Trustee Exhibit 8. Stenzel did not offer any evidence to rebut the veracity of the Schedules.

[25] Id. at Summary of Schedules – Amended.

[26] Id. at Schedule B, ¶ 16.

[27] Id. at Schedule A.

[28] Id. at Schedule B, ¶ 25, and Schedule D.

[29] Id. at Schedule B, ¶ 2, and Schedule D.

[30] Id. at Schedule B, ¶ 25, Exhibit to Schedule B, and Schedule D.

[31] Id. at Schedule B and Schedule C.

[32] Id. at Schedule F.

plus $2,090,552.00 as the unsecured portion of various secured claims,[33] all of which had been incurred years before Stenzel perfected a lien on the Corvette.[34] Accordingly, as of February 1, 2012, the Rheins' liabilities substantially exceeded their assets.

The Schedules as a whole indicate that the Rheins' financial distress had existed for at least a year prior to filing bankruptcy. During that prepetition year, eight creditors filed collection suits.[35] As of the petition date, the Rheins had no income, and had to borrow money from friends and relatives to pay their bankruptcy attorneys.[36] In addition, most of their 2011 income was generated by selling off assets.[37]

**Conclusions of law**

Section 548 of the Bankruptcy Code[38] empowers a trustee to avoid certain prepetition transfers of a debtor's property. In this case, Trustee alleges a "constructively fraudulent transfer" under § 548(a)(1)(B)– that is, a transfer not motivated by actual fraudulent intent but which nevertheless resulted in diminution of the estate available for distribution to unsecured creditors. Trustee has the burden of proving all elements of § 548(a)(1)(B) by a

---

[33] Id. at Schedule D.

[34] Id. at Schedule D and Schedule F.

[35] Id. at Schedule of Financial Affairs ("SOFA"), ¶ 4.

[36] Id. at Schedule I and SOFA, ¶ 9.

[37] Id. at SOFA, ¶¶ 1, 2 and 10.

[38] Unless otherwise indicated, all statutory references made herein are to sections of Title 11 of the United States Code.

preponderance of the evidence.[39] These elements are (1) the debtor had an interest in the property transferred; (2) the transfer occurred within two years of the bankruptcy filing; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; and (4) the transfer resulted in no value for the debtor or the value received was not "reasonably equivalent" to the value of the property transferred.[40] For the purpose of § 548, a transfer of an interest in a debtor's property occurs when the transfer is "so perfected that a bona fide purchaser from the debtor . . . cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee[.]"[41]

The first two elements are undisputed – Rhein owned the Corvette, and the lien was perfected on January 5, 2012 (the "Transfer Date"), well within the prepetition window. Stenzel contends, however, that Trustee did not establish that Rhein was insolvent on the Transfer Date, or that the value Rhein received was less than the value of the Corvette.

**Insolvency**

A debtor is insolvent if liabilities exceed the fair value of non-exempt assets.[42] "Insolvency is determined from the creditor's perspective by examining what assets are

---

[39] Mellon Bank, N.A. v. Official Committee of Unsecured Creditors (In re R.M.L., Inc.), 92 F.3d 139, 144 (3d Cir. 1996) (hereinafter, R.M.L.).

[40] 11 U.S.C. § 548(a)(1)(B).

[41] 11 U.S.C. § 548(d)(1).

[42] See 11 U.S.C. § 101(32)(A); Stillwater Nat'l Bank and Trust Co. v. Kirtley (In re Solomon), 299 B.R. 626, 638 (B.A.P. 10th Cir. 2003).

available and the value that could be realized for payment of debts."[43]  The sole unencumbered asset scheduled by the Rheins was a $3 million receivable for which Trustee found no factual or legal basis. Because the receivable is uncollectable, it must be disregarded in the insolvency analysis.[44]  As so adjusted, the Rheins' schedules reflect, as of the February 1, 2012, petition date, unsecured liabilities in excess of $11.5 million and no unencumbered non-exempt assets that could be liquidated for the benefit of these unsecured creditors. The evidence further established that the Rheins' debts eclipsed their assets long before the petition date. Accordingly, the Court concludes that the Rheins were insolvent on the Transfer Date.

**Reasonably equivalent value**

Voiding a transaction that meets the Bankruptcy Code's definition of a fraudulent transfer restores value to the estate that would have been available to the debtor's unsecured creditors had the transfer not occurred. Transferring one asset in exchange for another of equivalent value does not decrease the net worth of a debtor's estate.[45]  Further, in a standard two-party secured transaction, the debtor and the secured party generally exchange reasonably equivalent value because the secured party's lien on the debtor's property is limited in value to the amount of debt owed by the debtor to the secured party.

---

[43]Solomon, 299 B.R. at 639 n.54 (citations omitted).

[44]Id. (only assets that are not exempt and otherwise subject to liquidation for the benefit of creditors are considered in the insolvency analysis).

[45]Had Rhein transferred the Corvette in exchange for $241,000 cash or a promissory note and security interest, for instance, or traded it for another vehicle worth $241,000, the net estate available to his unsecured creditors would have remained constant.

11

In this case, however, Trustee established that Stenzel did not directly transfer anything of value to Rhein in exchange for Rhein's transfer of a security interest in a vehicle worth $241,000. Stenzel loaned $500,000 to RIL. Rhein did not receive any of the loan proceeds, nor did he own or gain any interest in RIL.[46]

"[W]hen a debtor transfers its property but the transferee gives the consideration to a third party, the debtor ordinarily will not have received fair consideration in exchange for its property."[47] But, under the "indirect benefits" doctrine, "the fact that the consideration initially goes to third parties may be disregarded to the extent that the debtor indirectly receives a benefit from the entire transaction."[48] The burden of proving and quantifying the indirect economic benefits a debtor received in exchange for a transfer falls on the

---

[46] Pre-Trial Order at 2, ¶¶ 12-14.

[47] HBE Leasing Corp. v. Frank, 48 F.3d 623, 638 (2d Cir. 1995).

[48] Id., *citing*, among other cases, Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979, 991-92 (2d Cir. 1981). See also R.M.L., 92 F.3d at 148-54. In R.M.L., the debtor guaranteed repayment of a third party's debt by granting a security interest in its assets, but did not directly receive any of the loan proceeds. In determining whether the security interest was an avoidable fraudulent transfer, the court had to consider whether the guarantor/debtor indirectly received value as a result of facilitating the loan to the third party. "The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred." Id. at 149 (*quoting* Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 646-47 (3d Cir. 1991)).

12

transferee.[49] The value of such indirect benefits is measured as of the Transfer Date, and is measured from the point of view of the debtor's unsecured creditors.[50]

Stenzel argues that the contractual right to collect a $250,000 commission and 2.5% of certain Newco revenues granted to Rhein in the Agreement ("Right to Commissions") was, on its face, reasonably equivalent to the value of the Corvette. Trustee contends, however, that the Right to Commissions was too speculative and remote to constitute value.[51] Stenzel is correct in that "the mere 'opportunity' to receive an economic benefit in the future constitutes 'value' under the Code."[52] Even investments that eventually fail may have value on the date of transfer; "[p]resumably the creditors whom § 548 was designed to protect want

---

[49] See Cooper v. Centar Investments (Asia) Ltd. (In re Trigem America Corp.), 431 B.R. 855, 868 (Bankr. C.D. Cal. 2010) ("Once the plaintiff makes a *prima facie* showing that no sufficient direct benefit was received in the transaction, it is the defendants' burden to prove sufficient *indirect* benefit that is tangible and concrete.") (emphasis in original) (citations omitted). Cf. Clark v. Security Pacific Business Credit, Inc. (In re Wes Dor, Inc.), 996 F.2d 237, 243 (10th Cir. 1993) (transferee failed to quantify claimed indirect benefits flowing to debtor as a result of debtor's pledge of assets to secure parent's debt).

[50] "Reasonably equivalent value" is the "objective market value [of the asset acquired by the debtor] at the time of the transfer, looked at from the creditor perspective." Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Financial Services, Inc.), 350 B.R. 559, 578 (Bankr. N.D. Okla. 2005) (*quoting* Official Committee of Creditors v. Shearson Lehman Bros. Holdings (In re First Capital Holdings Corp.), 179 B.R. 902, 907 (Bankr. C.D. Cal. 1995)). "[T]he central issue is whether the recovery the debtor's creditors could legitimately expect to realize from the asset received by the debtor is reasonably equivalent to the value of the asset transferred by the debtor." Id. at 577.

[51] Trustee also argued at the hearing that Rhein did not receive any consideration in exchange for posting collateral for RIL's debt because Lindsey had already promised Rhein the commissions for bringing a buyer to the transaction, and therefore Rhein was already entitled to the commissions when he granted the security interest to Stenzel. The Court declines to address this alternative argument in light of the result reached herein.

[52] R.M.L., 92 F.3d at 148.

13

a debtor to take *some* risks that could generate value and, thus, allow it to meet its obligations without resort to protection under the Bankruptcy Code[.]"[53] However, "while the chance of receiving an economic benefit is sufficient to constitute 'value,' the size of the chance is directly correlated with the amount of 'value' conferred."[54]

The Right to Commissions constituted an "opportunity" for future income. The question is whether, on the Transfer Date, there was a "legitimate and reasonable expectation"[55] that this opportunity had "realizable commercial value,"[56] and if so, whether that value was reasonably equivalent to the value of the Corvette.

One way to determine whether the value of the Right to Commissions was reasonably equivalent to the security interest in a vehicle worth $241,000 is to ask what a hypothetical buyer would have been willing to pay to take over Rhein's position in the Agreement as of

---

[53]Id. at 151 (emphasis original).  The Third Circuit joined the Fifth and Sixth Circuits in rejecting the "realized property" approach to value – that is, that "the only value that can be considered is property actually received.  Under this view the value of an investment – no matter how large and how probable the potential return – cannot be considered unless it actually pays off, and only to the extent that it does so."  Id. at 151-52 (*quoting* Butler Aviation Int'l, Inc. v. White (In re Fairchild Aircraft Corp.), 6 F.3d 1119, 1126-27 (5th Cir. 1993)).

[54]R.M.L., 92 F.3d at 153.

[55]Id. at 150.

[56]Id. at 149 (citation omitted).

14

the Transfer Date.[57] The Court must analyze the "totality of the circumstances" to determine the extent of value that could be realized through such a hypothetical sale.[58]

Stenzel apparently relies on the face value of the $250,000 commission as evidence of the indirect value Rhein obtained as a result of the transaction.[59] Face value must be reduced, however, by various factors, including but not limited to the probability of actually collecting the commission in light of the various contingencies and a reasonable discount rate to account for the time value of money. In considering the "totality of the circumstances," these factors and others are necessarily taken into account.

Relevant to the probability of collecting the commissions, the Court observes first that as a start-up, RIL had no financial, management, or performance history. Its initial favorable financial projections (*i.e.*, $12 million in revenues the first quarter) rested entirely upon (1) obtaining the putative contract to provide products for use at the 2012 NFL Super Bowl, (2) manufacturing and delivering the products on an expedited basis,[60] and (3) collecting for the goods sold. Rhein was not entitled to reap the $250,000 commission until RIL/Newco satisfied the $500,000 Stenzel Note[61] and generated another $1 million in profits, with the first

---

[57]See Sharp, 350 B.R. at 577 (hypothetical sale value).

[58]R.M.L., 92 F.3d at 153-54.

[59]Stenzel did not attempt to quantify the value of the 2.5% commissions.

[60]The 2012 Super Bowl was held on February 5, 2012, in Indianapolis, Indiana. http://en.wikipedia.org/wiki/Super_Bowl_XLVI (accessed on June 4, 2013).

[61]The amount due under the Stenzel Note increased to $602,000 a month or so after the Transfer Date.

$750,000 going to Stenzel. The probability that these preconditions would occur within the time frame set forth in the Agreement also depended exclusively upon the supposed revenue from the Super Bowl contract.

That said, the Court concludes that no reasonably diligent prospective purchaser would have paid $241,000 for the Right to Commissions on the Transfer Date unless it had, at the very least, assured itself of the existence and enforceability of the reputed Super Bowl contract. Because no contract existed on the Transfer Date, however, a prospective purchaser would have concluded that the probability that the preconditions to realizing the $250,000 commission would occur within a reasonable time, if ever, was highly speculative.[62] Further, upon discovering that no contract existed and that Lindsey had fabricated the Super Bowl opportunity, the hypothetical purchaser would reasonably doubt the veracity of other representations made in the Agreement and conclude that the prognosis for earning a 2.5% commission on future revenue generated by non-Super Bowl orders was so ethereal as to be worthless.

From the totality of the circumstances existing on the Transfer Date, the Court concludes that the value of the Right to Commissions on the Transfer Date was not "reasonably equivalent" to the value of the Corvette. To the extent that Stenzel contends that the Right to Commissions had some realizable commercial value as of the Transfer Date, Stenzel has failed to quantify such value.

---

[62] See, e.g., R.M.L., 92 F.3d at 153 (loan commitment fees paid by debtor in exchange for a conditional loan commitment provided no value to the debtor because "all parties should have known there was a substantial probability that the loan would not close.")

As Trustee has established all elements under § 548(a)(1)(B), he is entitled to avoid the transfer of the lien on the Corvette to Stenzel. And because Stenzel will no longer have an interest in the Corvette, Trustee is also entitled to an order requiring Stenzel to turn over possession and control of the Corvette to Trustee.

**Conclusion**

For the reasons stated above, the Court concludes that judgment should be granted in favor of Trustee and against Stenzel on Trustee's avoidance claim and on Trustee's turnover claim. Because Stenzel's lien on the Corvette is avoidable as a fraudulent transfer, Stenzel's motion for relief from the automatic stay and request for abandonment should be denied. A separate judgment and order will be entered forthwith.

**SO ORDERED** this 10th day of June, 2013.

DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE